```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
SHELLEY LYNN McLEAN,

                    Plaintiff,
                                          MEMORANDUM & ORDER
         -against-                        19-CV-6068 (JS)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
---------------------------------------X
APPEARANCES
For Plaintiff:     Michelle Spadafore, Esq.
                   New York Legal Assistance Group
                   7 Hanover Square, 18th Floor
                   New York, New York  10004

For Defendant:     Prashant Tamaskar, Esq.
                   United States Attorney's Office
                   Eastern District of New York
                   271 Cadman Plaza East, 7th Floor
                   Brooklyn, New York  11201

                   Oona Peterson, Esq.
                   Special Assistant U.S. Attorney, D.O.J
                   Office of the General Counsel
                   6401 Security Boulevard
                   Baltimore, Maryland  21235
```

SEYBERT, District Judge:

Plaintiff Shelly Lynn McLean ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of her application for Social Security Disability Insurance Benefits by the Commissioner of Social Security (the "Commissioner"). (Compl., ECF No. 1.)  Pending before the Court are the parties'

cross-motions for judgment on the pleadings.  (Pl. Mot., ECF No. 10; Pl. Support Memo, ECF No. 11; Pl. Reply, ECF No. 17; Comm'r Mot., ECF No. 14, Comm'r Support Memo, ECF No. 15.)  For the following reasons, Plaintiff's motion is GRANTED, and the Commissioner's motion is DENIED.

<u>BACKGROUND</u>[1]

I.  <u>Procedural History</u>

On December 30, 2016, Plaintiff completed an application for disability insurance benefits alleging disability as of June 30, 2015, due to bipolar disorder and depression.  (R. 69.)  After Plaintiff's claim was denied, on April 17, 2017, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 83.)  On February 27, 2019, accompanied by counsel, Plaintiff appeared virtually at a hearing before ALJ Susan Smith. (R. 37.)  Dr. James Soldner, a Vocation Expert ("VE"), testified at the hearing. (R. 50-52.)

In a decision dated April 3, 2019, the ALJ found Plaintiff was not disabled. (R. 7-23.)  On August 30, 2019, the

---

[1]  The background is derived from the administrative record filed by the Commissioner on May 7, 2020.  (<u>See</u> ECF No. 8.)  For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.  The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.  Hereafter, the administrative record will be denoted "R." When citing to the administrative record, the Court will use the relevant Bates number(s) provided therein.

Social Security Administrative Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-6.)

Plaintiff initiated this action on October 29, 2019. (See Compl.) On May 7, 2020, Plaintiff moved for judgment on the pleadings. (Pl. Mot.) The Commissioner cross-moved for judgment on the pleadings on August 20, 2020. (Comm'r Mot.) On September 10, 2020, Plaintiff filed her reply. (Pl. Reply.)

II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to her medical records and the VE's testimony.

A. Testimonial Evidence and Employment History

At the time of the hearing on February 27, 2019, Plaintiff was sixty-two years old. (R. 40.)  She joined the United States Marine Corps when she was twenty years old and served for nine years. (R. 40-41.)  During her time in the Marines, Plaintiff was an electronics technician and electrical troubleshooter for aircrafts. (R. 41.)  Plaintiff's highest level of education is a GED. (R. 40.)  After her time in the military, Plaintiff worked as a technical writer until she was terminated in June 2015. (R. 41-42.)  She testified she struggles interacting with others at work, creating the tension that allegedly led to her June 2015 termination. (R. 45-46.)  Although her experience was mostly in

technical writing, Plaintiff also performed gardening work "on the side." (R. 42.)  Her gardening jobs were sporadic, and she earned no more than $200 or $300 per month doing these jobs. (R. 44.)

Plaintiff expressed that she had been experiencing difficulty concentrating and finishing tasks. (Id.)  Plaintiff testified she believed some of these difficulties were attributable to her medications prescribed to her as part of her treatment plan. (Id.)  Nonetheless, Plaintiff has been "compliant with her medication for many, many years." (R. 45.)  Plaintiff explained she sometimes suffers from very dark and self-destructive thoughts upon waking and that while working on projects at home, she rarely finishes those projects. (R. 47.)

Plaintiff also testified she regularly sees a psychiatrist and a social worker, as well as participates in different group therapies through the VA Northport Medical Center, including a trauma group, a non-combat trauma group, art therapy, and an ACT[2] group. (R. 48-49.)  Further, while she has maintained sobriety for several years, Plaintiff testified she regularly

---

[2]  "ACT" is an acronym for "Acceptance and Commitment Therapy". See, e.g., Lilian Dindo, Julia R. Van Liew & Joanna J. Arch, Acceptance and Commitment Therapy: A Transdiagnostic Behavioral Intervention for Mental Health and Medical Conditions in Neurotherapeutics 546 (2017), available online at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5509623/#:~:text=Ac ceptance%20and%20commitment%20therapy%20(ACT,and%20challenges%20 in%20the%20field.

attends AA meetings.[3] (R. 49.)  Moreover, despite her efforts to mitigate symptoms through treatment, Plaintiff still struggles with her mental health.  Plaintiff further testified she struggles with symptoms stemming from military sexual trauma ("MST"). (Id.)

B. Medical Evidence

1. Dr. Cohen's Treatment Notes

Plaintiff began treatment with psychiatrist Dana R. Cohen, M.D. ("Dr. Cohen") in January 2013. (R. 34.) The record contains treatment notes from twenty of Plaintiff's appointments with Dr. Cohen spanning from 2015 through 2018. (R. 757, 753, 750, 745, 737, 733, 729, 726, 722, 719, 713, 707, 702, 696, 673, 636, 624, 610, 591, 584.)  On June 25, 2015, Plaintiff called Dr. Cohen to tell the Doctor she had been fired from her job after months of tension at her workplace. (R. 760.)  Plaintiff voiced concern that her firing would cause "another round of deep depression" as similar situations had done in the past. (R. 761.)  On September 3, 2015, Plaintiff visited Dr. Cohen for continued treatment for depression. (R. 757.)  A mental status exam indicated: an "ok" mood; a mildly constricted affect; normal thought processes; unremarkable thought content; and no suicidal or homicidal thoughts or ideations. (R. 757-58.)  At the appointment, Plaintiff and Dr. Cohen discussed next steps Plaintiff could take after her

---

[3]  The Court understands "AA" to mean "Alcoholics Anonymous".

firing to find other employment. (R. 758-59.)  Dr. Cohen increased Plaintiff's Venlafaxine prescription to 300mg for a more aggressive treatment of depression and maintained Plaintiff's 150mg prescription of Bupropion, also to treat her depression. (R. 759.)

At her next appointment with Dr. Cohen on November 16, 2015, Plaintiff reported a "good" mood, and the mental status examination indicated: a mildly constricted affect; normal thought processes; unremarkable thought content; and no suicidal or homicidal thoughts or ideation. (R. 754.)  Dr. Cohen noted Plaintiff's good mood corresponded with the increased dose of Venlafaxine since her prior appointment; she instructed Plaintiff to continue the same treatment plan. (R. 755.)  Plaintiff's next appointment with Dr. Cohen was on February 23, 2016, at which time the mental status exam reflected: a "decent" mood; a mildly constricted affect; normal thought processes; unremarkable thought content; and no suicidal or homicidal thoughts or ideation. (R. 750-51.)  While Plaintiff reported a relatively stable mood at that time, she also explained a potential job opportunity had fallen through and her finances were beginning to dwindle. (R. 751.)  Plaintiff's treatment plan of Bupropion and Venlafaxine remained the same. (R. 752.)

At a May 9, 2016, appointment with Dr. Cohen, Plaintiff reported her mood was "not good." (R. 746.)  The mental status

exam indicated: an irritable affect, with normal thought processes; unremarkable thought content; and no suicidal or homicidal thoughts or ideations. (Id.)  Plaintiff reported: irritability; low frustration tolerance; anger; rage; and a depressed mood. (R. 747.)  Due to these changes in her symptoms, Dr. Cohen revised Plaintiff's diagnosis to bipolar disorder. (Id.) Further, Plaintiff revealed she had been taking only half the prescribed doses of Bupropion and Venlafaxine (Id.)  In light of Plaintiff's new diagnosis, Dr. Cohen lowered the dose of Venlafaxine and prescribed Risperidone to stabilize Plaintiff's mood. (R. 748.)  Plaintiff claimed she had taken Risperidone in the past and it had been effective. (Id.)  During this appointment, Dr. Cohen and Plaintiff also discussed Plaintiff's background, including hardships she had experienced in her early childhood. (Id.)

On June 14, 2016, Plaintiff met with Dr. Cohen and reported her mood was "better than before." (R. 737.)  The mental status exam reflected: a minimally constricted affect, with normal thought processes; unremarkable thought content; and no suicidal or homicidal thoughts or ideations. (R. 737-38.)  However, Plaintiff also explained she experienced an allergic reaction to the Risperidone which had been prescribed during her previous appointment. (R. 738.)  She had been treated for the reaction at a walk-in clinic, where she was advised to stop taking Risperidone

and increase her dose of Venlafaxine back to 150mg. (R. 738-39.)
Dr. Cohen explained to Plaintiff the importance of mood stabilizers
for treating bipolar disorder and strongly encouraged her to
consider starting to take one. (R. 739.)  Plaintiff was reluctant
to start a new medication, expressing concerns regarding possible
side effects. (Id.)  Dr. Cohen and Plaintiff also reviewed the
psychiatric services available to Plaintiff through the VA.[4] (Id.)
At this time, Plaintiff's treatment plan reverted to 150mg of
Bupropion and 150mg of Venlafaxine, both to treat depression.
(R. 740.)

 During an appointment with Dr. Cohen on August 18, 2016,
Plaintiff reported a "better" mood on her mental status exam, which
also indicated: a minimally constricted affect, with normal
thought processes; unremarkable thought content; and no suicidal
or homicidal thoughts or ideations (R. 734.)  During her
appointment, Plaintiff described feeling "right on the edge of
depression," and Dr. Cohen noted that "anger had been alternating
with tearfulness and increased emotionality." (R. 735.)  Dr. Cohen
discussed the importance of mood stabilizing medication for
treating bipolar disorder and prescribed Lamictal for Plaintiff to
take in addition to Bupropion and Venlafaxine. (R. 735-36.) At
this appointment, Plaintiff and Dr. Cohen discussed the

---

[4]  The Court understands the "VA" to be shorthand for the U.S.
Department of Veterans Affairs.

possibility of applying for social security disability benefits as Plaintiff had in the past during periods of intense depression. (R. 735.)

During her September 29, 2016 appointment, Plaintiff's mental status exam reflected: an "ok" mood; minimally constricted affect; normal thought processes; and unremarkable thought content. (R. 730.) Dr. Cohen's noted Plaintiff "endorse[d] ongoing mood fluctuations and irritability." (R. 731.) Plaintiff also reported she had not been taking the Lamictal that was prescribed at her prior appointment, expressing concerns over its potential side effects. (Id.) Instead, Plaintiff expressed interest in trying Depakote for mood stabilization. (Id.) Dr. Cohen further noted Plaintiff's finances were extremely limited, affecting the amount of food she eats per day, and her support of Plaintiff applying for disability benefits. (Id.) Dr. Cohen also prescribed Depakote for mood stabilization to be taken with Bupropion and Venlafaxine for depression. (R. 732.)

On November 17, 2016, Plaintiff reported an "ok" mood on her mental status exam, which reflected: a minimally constricted affect; normal thought processes; and unremarkable thought content. (R. 726-27.) Dr. Cohen noted Plaintiff remained "fairly symptomatic." (R. 728.) Plaintiff reported taking Depakote in the evenings as instructed made her groggy in the mornings; thus, she began taking it in the mornings instead. (Id.) Plaintiff was

instructed to continue taking Bupropion and Venlafaxine for depression and Depakote for mood stabilization, with Dr. Cohen stressing the importance of daily compliance with this treatment plan. (R. 728-29.)

Plaintiff saw Dr. Cohen again on January 17, 2017. (R. 722.) Plaintiff reported an "ok" mood on her mental status exam, which also indicated: a minimally constricted affect; normal thought processes; and unremarkable thought content. (R. 723.) Plaintiff explained that three days after her prior appointment, she had stopped taking Depakote, the mood stabilizing medication. (R. 724.) Dr. Cohen explained the importance of a mood stabilizer as part of Plaintiff's treatment plan for bipolar disorder, and also discussed with Plaintiff alternative mood stabilizing medications. (Id.) The two further discussed various family stressors affecting Plaintiff, as well as Plaintiff's pending social security case. (Id.) Plaintiff's new treatment plan included starting Abilify for mood stabilization and bipolar depression, as well as continuing to take Bupropion and Venlafaxine. (R. 725.)

Plaintiff met with Dr. Cohen on February 28, 2017; at that time, Plaintiff stated she had been taking Abilify, but experienced no changes in her mood. (R. 719-20.) On her mental status exam, Plaintiff stated her mood was "ok . . . about the same"; she demonstrated: a minimally constricted affect; normal

thought processes; and unremarkable thought content. (R. 719-20.)
Dr. Cohen noted Plaintiff was dealing with several
"biopsychosocial stressors," including dwindling finances and the
rejection of her social security application. (R. 720.)  Despite
this, Dr. Cohen noted Plaintiff: remained future oriented; had
support from friends; and planned to challenge the recent denial
of her disability benefits application. (R. 720-21.)  Plaintiff's
Abilify prescription was increased to 10mg per day, and she was
instructed to continue taking Bupropion and Venlafaxine. (R. 721.)

During a March 7, 2017 phone call, Dr. Cohen instructed
Plaintiff to stop taking Abilify after Plaintiff voiced concern
over its potential contribution to physical side effects. (R. 718.)
Plaintiff then met with Dr. Cohen again on April 20, 2017.
(R. 713.)  At that time, her mental status exam reflected: an "ok
[mood]. . . about the same"; a mildly constricted affect; normal
thought processes; and unremarkable thought content. (R. 714.)
Plaintiff reported that: after the discontinuance of Abilify in
March, her symptoms worsened; therefore, she restarted taking the
medication; and, thereafter, her depression had improved, even
though she continued to "contend with low-grade dysphoria and
intermittent flares in symptoms." (R. 715.)  During this
appointment, Plaintiff and Dr. Cohen discussed: Plaintiff's
background of a "chaotic upbringing amongst 2 alcoholic parents
. . . and a physically abusive father"; Plaintiff's struggles with

alcohol dependence, and how -- although she has been sober for almost thirty years -- she continues to attend AA meetings regularly; Plaintiff's experience in the military; and the potential benefits of group therapy for depression, in which Plaintiff expressed mild interest. (Id.)  Plaintiff's treatment plan included Bupropion and Venlafaxine for depression and Abilify for mood stabilization and bipolar depression. (R. 716.)

On June 12, 2017, Plaintiff once again met with Dr. Cohen. (R. 707.)  In her mental status exam, the Doctor indicated Plaintiff reported her mood was "about the same" and presented: a mildly constricted affect; normal thought process; and unremarkable thought content. (Id.)  Plaintiff explained she had stopped taking Abilify after experiencing a muscle twitch in her face and a few falls at home, which she attributed to the Abilify. (R. 708.)  Plaintiff stated she was still taking her Bupropion and Venlafaxine. (Id.)  Dr. Cohen and Plaintiff discussed: Plaintiff's therapy intake meeting that happened in April 2017; group therapy offerings available through the VA; and Plaintiff's financial concerns and legal questions. (R. 709.)  Plaintiff was instructed to continue taking Bupropion and Venlafaxine but discontinue Abilify. (Id.)  Dr. Cohen also arranged a meeting for Plaintiff with a social worker. (Id.)

At her next appointment with Dr. Cohen on August 14, 2017, Plaintiff was "down, moody, [and] irritable." (R. 702.)  The

Doctor noted Plaintiff had lost seven pounds since her previous appointment. (R. 703.)  She also indicated Plaintiff continued to show depression, irritability, and mood lability, and that Plaintiff was affected by several psychosocial and financial stressors. (Id.)  At that time, Plaintiff was doing odd jobs and yard work, but was unable to make ends meet and was two months behind in making her house payments. (Id.)  Dr. Cohen and Plaintiff discussed the potential benefit of psychotherapy to treat Plaintiff's then-current struggles. (Id.)  They also discussed Plaintiff's treatment plan and the importance of considering a mood stabilizer, despite Plaintiff's continued reluctance to use one. (R. 703-04.)  Plaintiff was encouraged to consider other options for mood stabilizers that she had not yet tried and was instructed to continue taking Bupropion and Venlafaxine. (R. 704.)

Plaintiff's next appointment with Dr. Cohen was on September 25, 2027, during which she reported her mood was "still down [and] irritable".  (R. 696.)  Her mental status exam indicated: a mildly constricted affect; normal thought process; and unremarkable thought content. (R. 696-97.)  Dr. Cohen noted Plaintiff's depression has persisted and she was dealing with psychosocial stressors. (R. 697.)  For example, Plaintiff was months behind on making house payments and, while Plaintiff was performing yard work, she was not earning enough to make ends meet. (Id.)  Dr. Cohen discussed the importance of mood stabilizers with

Plaintiff and asked her to consider incorporating them into her treatment plan; Plaintiff continued to be reluctant in doing so. (R. 697-98.)  Plaintiff was instructed to continue taking Bupropion and Venlafaxine for depression. (R. 698.)  Dr. Cohen further noted Plaintiff was set that week to start group therapy for depression. (Id.)

During her November 13, 2017, appointment with Dr. Cohen, Plaintiff reported her mood was "still down, [and] irritable." (R. 674.)  The mental status exam indicated: a mildly constricted affect; normal thought processes; and unremarkable thought content. (Id.)  Dr. Cohen noted Plaintiff had been attending weekly group and individual therapy sessions. (R. 675.)  Dr. Cohen again discussed the importance and potential benefits of a mood stabilizer for treating bipolar disorder, "as well as complicated PTSD," which led to an extensive conversation regarding medications and further avenues of treatment. (Id.)  The Doctor and Plaintiff also discussed the risks of tapering off treatment and how this could potentially worsen Plaintiff's underlying symptoms. (Id.)  Plaintiff's treatment plan thereafter was to continue taking Bupropion and Venlafaxine and continue attending group and individual therapy. (R. 676.)

More than five months later, on May 1, 2018, Plaintiff once more met with Dr. Cohen. (R. 636.)  Dr. Cohen noted Plaintiff reported a "bleh" mood, with Plaintiff being treated for both

bipolar disorder and trauma related disorder. (R. 637-38.) Plaintiff explained that, since her previous appointment, she had stopped taking Bupropion and, thereafter, experienced several periods of fleeting suicidal ideation. (R. 638.) Further, Plaintiff's symptoms of depression had persisted, with: low frustration tolerance; irritability; anger; and racing thoughts. (Id.) Dr. Cohen discussed the benefits of starting Latuda, a mood stabilizer, a suggestion to which Plaintiff was open. (Id.) Plaintiff's treatment plan was to continue taking Venlafaxine and to begin taking Latuda for antidepressant augmentation and mood stabilization. (R. 639.) She was also advised to continue attending group and individual therapy. (Id.)

Plaintiff met with Dr. Cohen again on June 28, 2018. (R. 624.) At that time, Plaintiff's mood was "not that great," with her reporting continued symptoms of depression. (R. 625-26.) Her mental status exam reflected: a mildly constricted affect; normal thought processes; and unremarkable thought content. (R. 625.) Plaintiff also reported she had not begun taking Latuda as prescribed to her by Dr. Cohen at her last appointment; hence, Dr. Cohen reviewed the medication's benefits and potential side effects with her. (R. 626.) Dr. Cohen noted both Plaintiff's limited finances and desire to return to work as a technical writer, as well as her own uncertainty as to whether Plaintiff

would be able to return to full time work in that field given her psychiatric condition. (Id.)

At her appointment with Dr. Cohen on August 9, 2018, Plaintiff reported she was feeling "calmer" and had started taking the prescribed Latuda. (R. 611.) Plaintiff also identified "several ongoing psychosocial stressors" she was facing. (Id.) Plaintiff and Dr. Cohen further discussed the status of Plaintiff's disability benefits case and Plaintiff's experience in art therapy. (R. 611-12.)  The Doctor's notes also indicated Plaintiff was doing gardening and outdoor work. (R. 612.)

The record indicates Plaintiff missed her November 6, 2018 appointment with Dr. Cohen because she was dealing with the death of her father and had a cold. (R. 591.)  Thereafter, Plaintiff met with Dr. Cohen on December 10, 2018 and reported her mood was "not that great." (R. 585.)  Plaintiff expressed difficulty with motivation and an overactive mind, and that she was experiencing a mildly depressed mood. (R. 586.)  Plaintiff also discussed difficulty with concentration and decision making. (Id.)  Plaintiff shared photos of what she had been working on in art therapy. (Id.) Dr. Cohen's treatment notes indicate Plaintiff was to continue taking Venlafaxine and Latuda, and to continue attending individual and group psychotherapy and art therapy. (R. 587.)  Her notes further indicated Plaintiff was being treated for both bipolar disorder and trauma-related disorder. (R. 586.)

2.   <u>Dr. Cohen's Opinion Letters</u>

On October 4, 2016, Dr. Cohen completed a Medical Source Statement in support of Plaintiff's application for disability benefits. (R. 276.)  As part of her assessment, Dr. Cohen rated Plaintiff's ability to perform "basic mental activities of work on a regular and continuing basis." (<u>Id.</u>)  To that inquiry, Dr. Cohen responded Plaintiff would likely be absent from work more than four days per month due to her impairments and treatment and Plaintiff's limitations were likely to last more than twelve months. (R. 277.)  Dr. Cohen also indicated Plaintiff had "marked" limitations in the following areas: ability to understand, carry out and remember instructions; respond appropriately to supervision; respond appropriately to co-workers; respond to customary work pressures; use good judgment on the job; perform complex, repetitive, or varied tasks; and behave in an emotionally stable manner. (<u>Id.</u>) The Doctor noted an "extreme" limitation in Plaintiff's ability to respond appropriately to changes in the work setting, and a "moderate" limitation in Plaintiff's ability to perform simple tasks consisting of no more than one to two steps. (<u>Id.</u>)

In her January 2019 opinion, <u>i.e.</u>, the "Psychiatric Function Assessment" form (hereafter, the "Form"), Dr. Cohen indicated: Plaintiff's diagnoses were "Bipolar Disorder II; [and] Trauma Related Disorder" (R. 569); Plaintiff has a "marked" degree

of impairment in her ability to understand, remember, or apply
information due to her depression (R. 570); Plaintiff has a
"marked" degree of impairment in interacting with others, due to
her low frustration tolerance and irritability (id.); Plaintiff
has "marked" difficulty in concentration, persistence, or pace and
"marked" difficulty in adapting or managing herself.[5] (Id.)  Dr.
Cohen further responded that, as to satisfactorily maintaining
attention and concentration during an eight-hour workday,
Plaintiff could do so for less than 75% of the workday; moreover,
Plaintiff would likely be absent from work more than four days per
month due to her psychiatric symptoms. (R. 571.)  As part of this
Form opinion, Dr. Cohen completed a Checklist of Functional
Limitations, indicating "at least marked difficult[ies]" in the
following areas:  understanding, remembering, or applying
information; interacting with others; concentration, persistence,
or pace; and adapting or managing oneself.  (R. 572-73.)  Moreover,
Dr. Cohen indicated several areas in which Plaintiff "experienced
a substantial loss of ability" to meet basic mental demands of
work, including completing a normal workday or workweek without
interruptions from psychologically based symptoms. (R. 574.)  Dr.

---

[5]  Pursuant to the definition provided in the Form, a "marked"
degree of impairment means a claimant has a "seriously limited
ability to perform independently, appropriately, effectively, and
on a sustained basis." (Id.)

Cohen did not further elaborate in the provided "Comments" sections in the space provided. (R. 572-74.)

Later, Dr. Cohen authored a "To Whom It May Concern" letter, which she signed on June 13, 2019 (hereafter, the "June 2019 Letter"[6]); thereafter, it was submitted to the Appeals Council with Plaintiff's request for a review of the ALJ's decision. (R. 33-36.)   The June 2019 Letter indicated Dr. Cohen had treated Plaintiff since 2013 and had diagnosed Plaintiff with bipolar disorder II and post-traumatic stress disorder, with the latter diagnosis formally made in May 2018. (R. 34.)   Dr. Cohen explained: although Plaintiff expressed a desire to return to work, she would not have the capacity to do so because of her conditions (id.); Plaintiff's symptoms, including "ongoing irritability, poor emotion regulation, and limited distress tolerance . . . preclude her from participating in any meaningful work" (R. 35); and Plaintiff's participation in therapy groups should not be an indicator of her ability to maintain steady employment, as those therapy groups are time-limited, medically necessary components of her treatment plan. (Id.)   Moreover, Dr. Cohen warned Plaintiff's failure to participate in those therapy programs would likely worsen Plaintiff's health and destabilize her condition. (Id.)

---

[6]   The Court notes that above the "To Whom It May Concern" salutation of the June 2019 Letter was the date "May 28, 2019". (R. 33.)   However, as stated supra, Dr. Cohen signed said Letter on June 13, 2019.  (R. 36.)

C. The VE's Testimony

At the hearing before the ALJ, the VE testified to Plaintiff's work history as a technical publications writer, a gardener, and electronics technician. (R. 50-51.)  When asked to consider a hypothetical individual with Plaintiff's vocational profile and residual functional capacity ("RFC"), the VE testified such an individual would be able to perform her past work as a gardener, but not a technical publications writer or an electronics technician. (R. 51.)  Other available positions under this hypothetical would include: an industrial cleaner; a laundry worker; or a store laborer. (Id.)  When the ALJ added the further limitation that the hypothetical individual would be expected to be off task 25% of the time, the VE testified no work would be available for such individual. (R. 52.)

## DISCUSSION

I.  Standard of Review

In reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).  District courts will overturn an ALJ's decision only if the ALJ applied an incorrect

legal standard or if the ALJ's ruling was not supported by substantial evidence. Id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)). "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

## II.  The ALJ's Decision and the Five-Step Disability Analysis

First, the ALJ found Plaintiff meets the insured status requirements through December 31, 2020. (R. 12.)  The ALJ then applied the five-step disability analysis and concluded Plaintiff was not disabled from June 30, 2015, the alleged onset date, through April 3, 2019, the date of the decision. (R. 12-23.); see 20 C.F.R. § 404.1520.  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date, and, although Plaintiff had worked after the alleged onset date, such work did not rise to the level of substantial gainful activity. (R. 13.)

At step two, the ALJ determined Plaintiff's diagnosis of bipolar disorder II constituted a severe impairment. (Id.)  At this step, the ALJ noted, although the record references Plaintiff's reports of military trauma and her participation in trauma group therapy though the VA, "the record fails to establish the presence of a medically determinable trauma-related disorder."

(Id.)  The ALJ also explained that, while the record reflects several physical impairments, like knee pain, degenerative joint disease, and hypothyroidism, none of these conditions cause more than slight functional limitations and therefore, they are non-severe. (R. 14.)

At step three, the ALJ determined Plaintiff's impairment does not meet or medically equal the severity of any impairments listed in Appendix 1 of the Social Security regulation. (Id.)  In doing so, the ALJ considered four broad functional areas, known as the "paragraph B criteria," and found Plaintiff's condition was not severe as it did not result in at least one extreme or two marked limitations in: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) managing oneself. (R. 14-16.)  The ALJ found Plaintiff had a mild limitation in understanding, remembering, and applying information because she has been able to "ask questions and obtain assistance when needed . . . , [seek] out benefits and services in her community and through the VA, [complete] paperwork and [learn] new projects through art therapy." (R. 15.)  The ALJ also cited Plaintiff's ability to do projects around her house and help others. (Id.) The ALJ found Plaintiff had a moderate limitation in her ability to interact with others, because although she struggles to get along with people in the workplace, she interacted well with others

in her art therapy group. (Id.)   The ALJ found Plaintiff had a moderate limitation in her ability to concentrate, persist, and maintain pace because she was able to plan projects in art therapy, complete paperwork, and apply for benefits and assistance. (Id.) Next, the ALJ found Plaintiff had no limitations in adapting or managing herself as she lives independently, manages her home and finances, travels independently, and pursues treatment options and seeks out services through the VA. (R. 16.)   The ALJ further concluded Plaintiff did not satisfy any "paragraph C" criteria because she did not require a highly structured or supporting living arrangement to remain psychiatrically stable and there was no indication that a minimal increase in mental demands would cause her to decompensate. (Id.)

At step four, the ALJ determined Plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, repetitive tasks involving occasional contact with the public, co-workers and supervisors, and she can perform no work in teams or in tandem." (R. 16); see also 20 CFR § 404.1529.   To support her RFC determination, the ALJ considered Plaintiff's hearing testimony: she is a 62-year-old veteran; she was fired from her job; she does gardening work on the side; she experiences negative and self-destructive thoughts and has difficulty completing tasks; her treatment plan includes meeting with a

psychiatrist and a social worker, and attending group therapies, like art therapy. (R. 17.) The ALJ explained that, while some limitations may be warranted based on her medically determinable impairments, the intensity of Plaintiff's symptoms are not consistent with the medical records. (R. 18.)  The ALJ then summarized the medical records from Dr. Cohen, starting from June 2016 through January 2019. (R. 18-19.)  The medical records summary included Plaintiff's reported moods, mental status exam findings, and the medications she has been prescribed. (R. 18-19.)  The ALJ also noted Plaintiff was involved in several programs through the VA and had taken on several projects at home and for others, like fencing and yard work. (R. 19.)  Based upon Plaintiff's "wide range of activities and demonstrable progress in managing her condition despite not following through with some treatment recommendations," the ALJ found the record did not support a totally debilitating mood disorder. (Id.)

The ALJ also considered two opinions from Dr. Cohen: one from October 2016 and one from January 2019. (R. 20.)  She found they were unsupported by the medical record and were lacking narrative explanations and examples of ways in which Plaintiff was experiencing marked degrees of impairment; therefore, the ALJ afforded both opinions little weight. (Id.)  For example, though Dr. Cohen reports a marked degree of impairment in Plaintiff's ability to set goals and respond to demands, the ALJ noted the

record indicates Plaintiff's ability to do favors for friends, handle her father's affairs, reach out for help applying for benefits, and take on jobs when they came up. (Id.)  The ALJ also determined the mental assessment from the State agency was lacking weight since it did not reflect Plaintiff's "medically determinable severe mental impairment." (Id.)  Additionally, the ALJ accorded an RFC determination from Plaintiff's prior disability case of little weight as new evidence in the record no longer supported that assessment. (R. 20-21.)  In light of the evidence, the ALJ determined Plaintiff has a severe mood disorder that supports some social limitations and a reduction to simple tasks. (R. 20.)

Finally, at step five, the ALJ determined Plaintiff could perform her past work as a gardener, as well as other jobs in the national economy, as described by the VE during Plaintiff's hearing. (R. 21.)  Thus, based upon the VE's testimony and Plaintiff's RFC, age, education, and work experience, the ALJ determined Plaintiff is not disabled. (R. 22-23.)

III. Analysis

Plaintiff advances three arguments on appeal: (1) the ALJ failed to properly apply the treating physician rule by giving the opinions of the treating physician little weight (Pl. Br. 16); (2) the ALJ erred by finding no diagnosis of trauma-related disorder (id. at 20); and (3) Defendant failed to consider new and

material evidence that could reasonably change the outcome. (Id. at 21). Because the Court finds the third argument dispositive, it will address that argument first. The Court will then address the treating physician argument, followed by the factual error argument.

A. <u>New and Material Evidence</u>

Under 20 C.F.R. §§ 404.970(b) and 416.1470(b), a claimant may submit new evidence to the Appeals Council if it is "new," "material," and "relates to the period on or before the [ALJ's] hearing decision." Evidence is "new" if it is "not merely cumulative of what is already on the record." <u>Tirado v. Bowen</u>, 842 F.2d 595, 597 (2d Cir. 1988) (quoting <u>Szubak v. Sec'y of Health & Hum. Servs.</u>, 745 F.2d 831, 833 (3d Cir. 1984)). Evidence is "material" if it is relevant to a plaintiff's condition during the time period at issue and is probative, such that there is a "reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." <u>Id.</u>, (citing <u>Szubak</u>, 745 F.2d at 833; <u>Cutler v. Weinberger</u>, 516 F.2d 1282, 1285 (2d Cir. 1975)).

"When the new evidence submitted to the Appeals Council includes the opinion of a treating physician, . . . the Appeals Council must give the same degree of deference to this opinion that an ALJ would be required to give" under the treating physician rule. <u>Garcia v. Comm'r of Soc. Sec.</u>, 208 F. Supp. 3d 547, 552

(S.D.N.Y. 2016) (citing Snell v. Apfel, 177 F.2d 128, 134 (2d Cir. 1999)).  Under the rule, an ALJ who chooses not to give the opinion of a treating physician controlling weight must provide "good reasons" for the weight given to the opinion. See id. (citing Halloran v. Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004)). Similarly, the Appeals Council must explain the weight it gives to a treating physician's opinion. Snell, 177 F.3d at 133.  Where the Appeals Council fails to appropriately consider new and material evidence in light of the treating physician rule, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence." See Shrack v. Astrue, 608 F. Supp. 2d 297, 302 (D. Conn. 2009).

Plaintiff argues Defendant failed to properly consider new and material evidence submitted to the Appeals Council.  The Court agrees.  After her application for benefits was denied by the ALJ, Plaintiff appealed the decision and submitted a new opinion letter, i.e., the June 2019 Letter, from her treating physician, Dr. Cohen. (R. 34-36.)  The Letter was meant to fill the gaps and address the deficiencies in the record that ultimately led the ALJ to assign little weight to Dr. Cohen's previous opinion letters, as well as provide a narrative explanation of Plaintiff's condition.  Specifically, the June 2019 Letter addressed Plaintiff's diagnoses of both bipolar disorder and post-traumatic stress disorder. (R. 34.)

In its decision, the Appeals Council acknowledged Dr. Cohen's June 2019 Letter submitted with the appeal but found it did "not show a reasonable probability that it would change the outcome of the decision." (R. 2.)   However, because the new evidence was submitted by Plaintiff's treating physician, the Appeals Council is bound by the treating physician rule and needed to provide "good reasons" for the weight given to the June 2019 Letter. See Garcia, 208 F.Supp.3d at 552 (finding legal error where Appeals Council said only that the new evidence "d[id] not provide a basis for changing the ALJ's decision"); Collazo v. Colvin, 2015 WL 9690324, at *13 (S.D.N.Y. Dec. 22, 2015) (finding insufficient to satisfy the treating physician rule a bald statement from the Appeals Council that it considered new evidence but said evidence did not provide a basis for changing ALJ's decision); Lebow v. Astrue, No. 13-CV-5895, 2015 WL 1408865, at *6-7 (S.D.N.Y. Mar. 9, 2015) ("The Appeals Council's failure to evaluate this additional evidence in the manner required by the treating physician rule was legal error and prejudiced [claimant]."), report and recommendation adopted, 2015 WL 1439270 (S.D.N.Y. Mar. 30, 2015).

Applicants are entitled to know why the Commissioner has decided to disagree with their treating physician(s) and, thus, must be provided with a statement of reasons why a physician's finding of disability has been rejected. See Snell, 177 F.3d at 134.   Because the Appeals Council failed to provide good reasons

for rejecting treating physician Dr. Cohen's June 2019 Letter, i.e., not explaining why said opinion letter did not provide a reasonable probability that it would change the outcome of the ALJ's decision, the case must be remanded for further proceedings in light of the new evidence and in accordance with this Opinion.

   B. The Treating Physician Rule[7]

      Plaintiff alleges Defendant committed legal error by giving the opinions of Plaintiff's treating physician, Dr. Cohen, little weight.  Under the treating physician rule, the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  The regulation states:

> Generally, we give more weight to medical
> opinions from your treating sources . . . .
> [I]f we find that a treating source's medical
> opinion on the issue(s) of the nature and
> severity   of   your   impairment(s)   is
> well-supported   by   medically   acceptable
> clinical and laboratory diagnostic techniques
> and   is   not   inconsistent   with   the   other

---

[7]  "In 2017, new SSA regulations came into effect.  The newest regulations apply only to claims filed with the SSA on or after March 27, 2017.  Accordingly, because Plaintiff's claim was filed in 201[6], the Court applies the regulations that were in effect at the time of filing." Cervini v. Saul, No. 17-CV-2128, 2020 WL 2615929, at *5 (E.D.N.Y. May 21, 2020) (citing Ogirri v. Berryhill, No. 16-CV-9143, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); Rousey v. Comm'r of Soc. Sec., No. 16-CV-9500, 2018 WL 377364, at *8 n.8, *12 n.10 (S.D.N.Y. Jan. 11, 2018) (same)).

substantial evidence in your case record, we
will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). However, the opinion of a treating
physician need not be given controlling weight where "the treating
physician issued opinions that are not consistent with other
substantial evidence in the record." Halloran, 362 F.3d at 32
(citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)); 20
C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating physician's opinion
controlling weight, "it must determine how much weight, if any, to
give it" by "explicitly consider[ing] the following, nonexclusive
Burgess factors: (1) the frequency, length, nature, and extent of
treatment; (2) the amount of medical evidence supporting the
opinion; (3) the consistency of the opinion with the remaining
medical evidence; and (4) whether the physician is a specialist."
Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019) (internal
quotation marks and brackets omitted); see also Burgess v. Astrue,
537 F.3d 117, 129 (2d Cir. 2008). The ALJ must also set forth
"'good reasons' for not crediting the opinion of a [plaintiff's]
treating physician." Schnetzler v. Astrue, 533 F. Supp. 2d 272,
287 (E.D.N.Y. 2008); see Estrella, 925 F.3d at 96. An ALJ provides
"'good reasons' for discounting a treating physician's opinion
that reflect in substance the factors as set forth [above], even
though the ALJ declines to examine the factors with explicit

reference." <u>Cromwell v. Comm'r of Soc. Sec.</u>, 705 F. App'x 34, 35 (2d Cir. 2017).

An ALJ's failure to explicitly apply these factors when assigning weight to a treating physician's opinion is a procedural error; however, where "'a searching review of the record' assures [the court] 'that the substance of the treating physician rule was not traversed,'" the Court will affirm. <u>Estrella</u>, 925 F.3d at 96 (quoting <u>Halloran</u>, 362 F.3d at 32). "If the Commissioner has not otherwise provided good reasons for its weight assessment, we are unable to conclude that the error was harmless and consequently remand for the ALJ to comprehensively set forth its reasons." <u>Id.</u> (internal quotation marks and brackets omitted).

Plaintiff argues the ALJ erred in giving little weight to the opinions of Dr. Cohen, Plaintiff's treating physician. (Pl. Brief at 16.) Plaintiff further contends the ALJ did not properly apply the factors used to determine how much weight a treating physician's opinion is given. (<u>Id.</u> at 16-17.) Again, the Court concurs. Here, the ALJ did not explicitly discuss the <u>Burgess</u> factors in granting "little weight" to the opinion of Dr. Cohen, Plaintiff's treating physician. Rather, the ALJ gave Dr. Cohen's opinion little weight because she found "the objective record . . . [did] not support h[er] statements." (R. 20.) "Even if the ALJ had provided a sufficient discussion of the evidence supporting and contradicting" Dr. Cohen's opinions, the decision says nothing

about the frequency, length, nature, and extent of treatment, nor about Dr. Cohen's "relevant expertise" treating veterans. See Persaud v. Comm'r of Soc. Sec., No. 22-2640, 2023 WL 7211823, at *2 (2d Cir. Nov. 2, 2023).

Yet, the record evidences a lengthy and regular treating relationship between Plaintiff and Dr. Cohen. Plaintiff has been Dr. Cohen's patient since 2013; the record includes treatment notes from twenty appointments spanning from 2015 through 2018. (R. 569; see also id. at 757, 753, 750, 745, 737, 733, 729, 726, 722, 719, 713, 707, 702, 696, 673, 636, 624, 610, 591, 584.)  Given this lengthy patient-doctor relationship, the Court cannot be sure the ALJ would have assigned Dr. Cohen's opinions "little weight" if she had explained her consideration of the Burgess factors.

Moreover, it is not unusual that "[a] mental health patient may have good days and bad days [and] may respond to different stressors that are not always active." Bodden v. Colvin, No. 14-CV-08731, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015). Thus, "adherence to the treating physician rule is 'all the more important in cases involving mental health, such as this one" and "a longitudinal understanding of the claimant's impairment is particularly important with respect to mental health conditions and cannot be readily achieved by a single consultative examination." Arias v. Kijakazi, 623 F. Supp. 3d 277, 285 (S.D.N.Y. 2022) (internal quotation marks and brackets omitted); see also

Windley v. Comm'r of Soc. Sec., No. 20-CV-0361, 2022 WL 17824051,
at *9 (E.D.N.Y. Dec. 19, 2022) (finding, where the ALJ failed to
properly consider the relevant Burgess factors before deciding not
to assign controlling weight to claimant's treating physician's
opinion, "the ALJ violated the treating physician rule, warranting
remand"); Diaz v. Comm'r of Soc. Sec., No. 21-CV-1609, 2022 WL
16715920, at *4 (E.D.N.Y. Nov. 4, 2022) ("The failure to provide
'good reasons for not crediting the opinion of a claimant's
treating physician is a ground for remand" (quoting Greek v.
Colvin, 802 F.3d 370, 375 (2d Cir. 2015); further citation
omitted); cf. Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)
("Remand may be appropriate . . . where . . . inadequacies in the
ALJ's analysis frustrate meaningful review."). Indeed, in
according little weight to Dr. Cohen's reports, the ALJ relied
upon, inter alia, Plaintiff's participation in various group
therapies, helping others, being able to travel, handling her
father's affairs, and applying for various benefits as evidence of
Plaintiff's significantly improved symptoms had and retaintion of
the capacity for regular work. (R. 19-20.) However, such
activities "ha[ve] little relevance to [Plaintiff's] ability to
function in a work setting where [s]he would need to interact
appropriately with co-workers and take instructions from authority
figures." Ferraro v. Saul, 806 F. App'x 13, 16 (2d Cir. 2002).
Therefore, like the Ferraro Court and upon the instant record

presented, because the ALJ has failed to provide "good reason" for assigning little weight to Dr. Cohen's reports, remand is warranted.

     C. Factual Error

          Plaintiff claims the ALJ's finding of no diagnosis of a trauma-related disorder at Step 2 of the disability analysis was factually erroneous because a diagnosis of trauma-related disorder or PTSD appears throughout the record, and because the ALJ's RFC assessment did not account for the limitations specifically caused by Plaintiff's trauma-related disorder.

          Under the "harmless error doctrine," a reviewing court must reverse and remand when an ALJ errs unless, as a matter of law, the result of the ALJ's decision was not affected by the error, or the same result would have been reached had the error not occurred. Snyder v. Colvin, No. 5:13-CV-0585, 2014 WL 3107962 (N.D.N.Y. July 8, 2014) (adopting in entirety May 21, 2014 Report and Recommendation, which was incorporated into the district court's adoption order and which cites NLRB v. Enterprise Assoc., 429 U.S. 507, 522 n.9 (1977), and Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Courts within and outside the Second Circuit have found that "when an [ALJ] identifies some severe impairments at Step 2, and then proceeds through sequential evaluation on the basis of combined effects of all impairments, including those erroneously found to be non severe, an error in failing to identify

<u>all</u> severe impairments at Step 2 is harmless." <u>Id.</u> at *5 (citing <u>Stanton v. Astrue</u>, 370 F. App'x 231, 233 n.1 (2d Cir. 2010)).

Here, in light of Plaintiff's other diagnoses, it is unclear whether the ALJ's finding of no diagnosis of a trauma-related disorder at Step 2 is a harmless error or if a finding of a trauma-related disorder at Step 2 would have affected the ALJ's decision.  Yet, because the Court has already determined the case is to be remanded, it need not decide this issue.  For clarity: Upon remand, Plaintiff may present her arguments that she was being treated for a trauma-related disorder and present evidence that she suffered from such a disorder.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 10) is GRANTED, and the Commissioner's Motion (ECF No. 14) is DENIED.  This matter is REMANDED for proceedings consistent with this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly and, thereafter, mark this case CLOSED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     November 20, 2023
           Central Islip, New York